# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                          Plaintiff,

v.                                                        Case No. 20-CR-214-JPS

FABIAN JOHNSON,

                          Defendant.                      **ORDER**

---

On November 10, 2020, the Government filed a three-count indictment charging Fabian Johnson with violations of 21 U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 922(g)(1), 924(a)(2), (c)(1)(A)(i). (Docket #1). On February 22, 2021, Johnson filed a motion to suppress and a motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). (Docket #13). The Government filed a short brief opposing the *Franks* hearing, (Docket #15), followed by a lengthier response brief, (Docket #18). The motion to suppress became fully briefed on March 19, 2021. (Docket #21). That same day, Johnson filed a motion for leave to file a second motion to suppress. (Docket #22).

On March 25, 2021, Magistrate Judge William E. Duffin issued a Report and Recommendation (the "R&R") in which he denied the first motion to suppress and struck as untimely the second motion to suppress. (Docket #27). After an unopposed motion to extend time to file objections, (Docket #28), the R&R is now fully briefed, complete with two motions from the Government for leave to file a sur-reply based on Johnson's arguments regarding the stricken second motion to suppress. (Docket #34, #35). For the reasons explained below, the Court will overrule Magistrate Judge Duffin's

R&R and grant the motion to suppress. Johnson's motion to extend time (Docket #28) will be granted, as will the Government's motions for leave to file a sur-reply (Docket #34, #35). Johnson will be given leave to file a second motion to suppress, and the Court will consider a renewed motion for a *Franks* hearing, if necessary.

1.    **LEGAL STANDARD**

When reviewing a magistrate judge's recommendation, the Court is obliged to analyze de novo "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id*. The Court's review encompasses both the magistrate judge's legal analysis and factual findings. *Id*.; *see also* Fed. R. Crim. P. 59(b).

2.    **FACTUAL BACKGROUND**

Johnson disputes Magistrate Judge Duffin's characterization of the facts, so the Court reviews them de novo. On Tuesday, February 4, 2020, at approximately 4:15 p.m., Milwaukee Police Officer Ryan DeWitt ("DeWitt") was on patrol in an undercover police car. He drove into the parking lot of a Wendy's fast-food restaurant, just down the street from the police department. DeWitt noticed three cars parked along the south side of the parking lot. Two of them were running. One of these cars, a white Volkswagen Jetta (the "Jetta"), contained a White female later identified as Anna Bilda ("Bilda").

DeWitt describes the Wendy's parking lot as a "known location utilized by mobile drug dealers to meet drug users and conduct narcotics transactions." (Docket #18-1 at 1). In the previous fourteen months, there had been two other drug-related arrests in the parking lot, both of which

occurred in early July 2019. (Ex. 5 ¶ 3). The Wendy's parking lot is down the block from a police station, and the surrounding area sees a fair amount of police activity.

DeWitt parked on the passenger side of the Jetta and watched Bilda. She was not eating food, and DeWitt did not "observe any fast-food bags on the front seat of the vehicle." (Docket #18-1 at 1). It is not clear what make or model of car DeWitt drove and, therefore, how he would have been able to see anything on the passenger seat of the Jetta. The individuals in the other running vehicle did not appear to be eating, either.

Five minutes later, a Chevrolet Equinox (the "Equinox"), driven by a man who would be later identified as Johnson, entered the parking lot, bypassed the Wendy's drive-through, and parked on the driver side of the Jetta. The Equinox's windows featured "excessive tint" on the passenger side and rear window. *Id.* Bilda promptly got into the passenger side of the Equinox. DeWitt noticed that Bilda was wearing "form fitting work clothing," and did not appear to be carrying or concealing anything. *Id.* at 2. Nonetheless, suspecting that a drug transaction was about to occur, DeWitt called for backup. The two individuals sat in the Equinox for approximately four minutes before backup arrived and the police intervened.

Two of the police officers to respond to the call were Milwaukee Police Officers Joshua Kranz ("Kranz") and Jeffrey Jopp ("Jopp"). The officers began the traffic stop at 4:24 p.m. The official basis for the stop was excessively tinted windows. Kranz's report states that he "observed furtive movements between the driver and passenger as [the police] approached as well as Johnson reaching around the vehicle and appeared nervous while asking basic questions." *Id.* at 3. Based on the Court's review of Kranz's

body camera footage, these furtive movements were not visible due to the tinted windows of the car. (*See* Ex. 3).

While conducting the stop, Kranz observed Johnson holding a plastic bag. He asked Johnson what was in the bag, and Johnson replied, "[i]t's just cookies." Johnson handed the bag to Kranz, who looked inside the bag and, evidently seeing nothing of concern, discarded it.

A review of Jopp's body camera footage demonstrates that Johnson was respectful, compliant, and calm given the circumstances. (*See* Ex. 2). Jopp ordered Johnson out of the car, ignored Johnson's question about whether he had done anything against the law, conducted a pat-down search for weapons, and escorted him to the back of a police car, where he was questioned. Once Johnson was inside the police car, Jopp asked what he and Bilda were meeting for, and Johnson replied, "[w]e had a union meeting. She . . . worked at my spot, we're just talking about work." *Id.* at 1:40–1:49. Indeed, Johnson was wearing a toolbelt, and both Johnson and Bilda wore fluorescent shirts bearing the name of the same company.

At about 4:27 p.m., Jopp left Johnson in the back of his police car, and proceeded to make a call on his radio, wherein he described the reason for the stop as "drug activity." *Id.* at 3:03. He asked for a canine but was informed that it might be a while.

Jopp then walked over to Bilda, who had also been ordered out of the Equinox but had not been escorted into a police car. Jopp asked what she and Johnson were doing, and she replied, "[w]e were just hanging out after work, sometimes—we were going to go to the meeting, the union meeting, but we didn't, [we're] just hanging out." *Id.* at 3:33–3:39. Later in the stop, Bilda explained that she was a mason and worked at a site in Lake

Geneva. Jopp walked over to the Equinox, looked inside the open window, then walked back to his car.

Shortly thereafter, at around 4:32 p.m., Jopp reapproached Johnson with another tactic. Jopp explained that the Equinox matched the description of a car that had a gun in it and asked if the police could search the car. (Ex. 10). Johnson said he did not have a gun, and he refused to give consent to search the car. He also stated that it was not his car (it belonged to his girlfriend, Ermeline Jenkin ("Jenkins")).

As for the window tint investigation, at 4:38 p.m.—fourteen minutes after the initial stop—Jopp finally asked Kranz if he had a window tint meter. Kranz replied that it was at the district police station. At 4:42 p.m., two other backup officers left the Wendy's parking lot and returned at 4:49 p.m. with a tint meter. (Ex. 12 at 13:04). At approximately 4:53 p.m., the officers conducted the tint-check and determined that the tint was, in fact, too dark. (Ex. 11 at 10:32).

At some point during the nearly forty-minute stop, a Department of Transportation search revealed that Johnson had been placed on extended supervision beginning on September 12, 2017. Upon learning that Johnson was on extended supervision, the officers decided to search the Equinox. Thus, at 5:02 p.m.—seven minutes after the tint measurement and thirty-eight minutes into the stop—the officers decided to conduct a search pursuant to Wisconsin Statute section 302.113(7r), which permits searches of supervisees upon a showing of reasonable suspicion that a crime or violation of supervised release has been or will be committed. In the center console, they discovered a glass mason jar containing individually wrapped, clear, plastic, knotted bags of what they believed to be marijuana, as well as a clear plastic bag containing what appeared to be cocaine.

Case 2:20-cr-00214-JPS   Filed 01/11/22   Page 5 of 25   Document 40

Later that day, Dewitt, Kranz, and Officer Matthew Link went to Johnson's home "in the attempt [to] conduct a knock and talk." (Docket #18-1 at 10). As they knocked on the door, the Equinox pulled up to the residence and parked around the back. A woman later identified as Jenkins emerged from the Equinox and confirmed that she lived at the house with Johnson and her son. Jenkins let the officers into the house and informed them that she had a firearm in her bedroom as well as a gram of marijuana. The officers asked her permission to search the residence, and she declined to let them search without a warrant. The officers obtained a warrant and searched the home. In the master bedroom, officers found guns, assorted ammunition, marijuana, cocaine, and heroin, as well as various packaging items.

3.    ANALYSIS

3.1    **Prolonged Delay**

The initial, pretextual traffic stop regarding the window tint was constitutional because the officers had probable cause to believe that Johnson had committed a traffic violation. *Whren v. United States*, 517 U.S. 806, 810 (1996). Additionally, "[a] seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). However, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez*, 575 U.S. at 350.

"Authority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 349.

Johnson allows that some preliminary investigation, including asking his name and running his driver's license, would have been directly related to the tint investigation. But the time between when he was ordered out of the vehicle and when the tint meter was finally mentioned by the police—some thirteen minutes—had nothing to do with investigating the tint. During that time, the police patted Johnson down for weapons, questioned him about what he was doing in the parking lot, summoned a drug-sniffing dog, and attempted to get Johnson to consent to a car search by saying they had a gun complaint for a car that looked like the Equinox. None of the body-worn camera footage shows the officer investigating the tint during this time. *C.f. United States v. Lewis*, 920 F.3d 483, 492 (7th Cir. 2019) (upholding a traffic stop where the defendant did not demonstrate that the police's questions "prolonged the process of issuing the warning. The video and testimony both document [the officer] worked on the warning while talking with [the defendant]"); *United States v. Cole*, No. 20-2105, 2021 WL 5984977, at *8 (7th Cir. Dec. 17, 2021) (finding travel-plan questions that relate to the underlying traffic violation are within the mission of the stop and do not prolong it, but that such questions "go too far when they are no longer reasonably related to the stop itself (and related safety concerns) but rather reflect an independent investigation of other criminal activity.").

Eventually, at approximately 4:38 p.m.—fourteen minutes into the stop—one of the officers asked about getting a tint meter. After that, the officers completed the investigation within seventeen minutes, including writing a citation and testing the windows. (Docket #29 at 6–7). Assuming these seventeen minutes were reasonable (the Court makes no finding on

Case 2:20-cr-00214-JPS   Filed 01/11/22   Page 7 of 25   Document 40

this issue; it is not clear why it took so long to test the windows given the presence of multiple police officers and the fact that the district office was right down the block), this stop could have been completed in less than twenty minutes. Instead, it took nearly forty minutes because the police held Johnson in the back of a police car for thirteen minutes while they looked for reasonable suspicion of drug activity, and failed to diligently pursue the tint violation.[1]

Magistrate Judge Duffin states that there must be a causal relationship between unconstitutional delay and discovery of evidence. (Docket #26 at 6). In this case, there was—or there would have been, if the police had managed to find anything suspicious. The delay was used to question Johnson and Bilda for approximately thirteen minutes about their activities and observe their demeanors, and call for a drug-sniffing dog, with apparently no attempt to diligently pursue the tint violation. *See Rodriguez*, 575 U.S. at 357 (noting that an officer must always be "reasonably diligent"); *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002) ("Questioning that prolongs the detention, yet cannot be justified by the purpose of such an investigatory stop, is unreasonable under the [F]ourth [A]mendment.") (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)); *Cole*, 2021 WL 5984977, at *8 ("[Questions] go too far when they are no longer reasonably related to the stop itself (and related safety concerns) but rather reflect an independent investigation of other criminal activity."). This was unconstitutional.

_____

[1] Johnson was held for approximately eight more minutes after the tint investigation, but before he was placed in handcuffs—perhaps this is when the car search occurred.

But this is not the only reason the stop was unreasonable. As will be discussed below, the search, once conducted, was not tailored to the suspected violation of supervised release. Additionally, there was no reasonable suspicion that Johnson was engaged in drug activity.

### 3.2    The Reaches of the Act 79 Search

Johnson was on extended supervision pursuant to Wis. Stat. § 302.113(7r) ("Act 79"), which permits warrantless searches of supervisees if officers have a reasonable suspicion that a crime or a violation of supervised release is afoot. The Seventh Circuit recently upheld Act 79 searches as constitutional. *United States v. Caya*, 956 F.3d 498, 500 (7th Cir. 2020). The Seventh Circuit's holding was predicated on *Samson v. California*, 547 U.S. 843, 847 (2006), wherein the Supreme Court evaluated the constitutionality of California Penal Code § 3067(a), which requires parolees to "agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." The *Samson* court evaluated the reasonableness of the search under the Fourth Amendment by using the balancing test previously set forth in *United States v. Knights*, which balances, on the one hand, the degree to which a search "intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." 534 U.S. 112, 118–19 (2001) (internal quotations omitted).

In assessing the legitimacy of the parolee's privacy interests, the *Samson* court found it relevant that (1) parolees "have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment;" and (2) the search term in question, which *required* inmates to agree to "submit to suspicionless searches by a

Case 2:20-cr-00214-JPS    Filed 01/11/22    Page 9 of 25    Document 40

parole officer or other peace officer at any time," had been "clearly expressed to the petitioner," and the petitioner had, in fact, agreed in writing to the condition, and therefore was "unambiguously aware of it." 547 U.S. at 852 (internal quotations omitted); *see also United States v. Williams,* 702 F. Supp. 2d 1021, 1029–30 (N.D. Ill. 2010) (noting *Samson*'s requirement of a pertinent search condition).

After examining the totality of the circumstances, the *Samson* court concluded that the petitioner did not have a legitimate privacy interest at least in part because he had been told that he was subject to suspicion-less searches anytime, anywhere. *Samson*, 547 U.S. at 852. This is logical—if a person has been explicitly told by a state's department of corrections that a condition of his release from prison is that he can be searched anytime, anywhere, for no reason at all, then it would be unreasonable for him to expect privacy from those searches. Crucially, the Supreme Court did *not* hold that parolees, like prisoners, have *no* reasonable expectation of privacy at all. 547 U.S. at 852 n.2. ("If that were the basis of our holding, then this case would have been resolved solely under *Hudson v. Palmer*, 468 U.S. 517 (1984), and there would have been no cause to resort to Fourth Amendment analysis."). Rather, the Supreme Court considered the parolee's status and the terms of the search condition as part of the inquiry into the strength of his privacy interest.

It is also important to note that the holdings in *Knights* and *Samson* are not predicated on the supervisee's consent to the search. *Caya*, 956 F.3d at 503 (citing *Samson*, 547 U.S. at 852 n.3 ("[W]e decline to rest our holding today on the consent rationale."); *Knights*, 534 U.S. at 118 ("We need not decide whether Knights' acceptance of the search condition constituted consent . . . because we conclude that the search of Knights was reasonable

under our general Fourth Amendment approach . . . .")). Rather, for Fourth Amendment purposes, the supervisee's awareness of and consent to the search terms is relevant only insofar as it pertains to his reasonable expectation of privacy. *Samson*, 547 U.S. at 852 (finding it "salient" that the search condition was "clearly expressed" and the petitioner was "unambiguously" aware of it). Indeed, the *Samson* court concluded that, under "the totality of the circumstances pertaining to petitioner's status as a parolee, . . . including the plain terms of the parole search condition"— which, recall, required the parolee to agree in writing to the sweeping search term—"we conclude that petitioner did not have an expectation of privacy that society would recognize as legitimate." *Id.*

In this case, Johnson was on extended supervision pursuant to Act 79, which gave him notice that he "may be searched by a law enforcement officer at any time during his or her period of supervision if the officer reasonably suspects that the person is committing, is about to commit, or has committed a crime or a violation of a condition of release to extended supervision." Wis. Stat. § 302.113(7r). The statute contains a limiting provision, which requires the searches to be conducted in a "reasonable manner" and further explains that they "may not be arbitrary, capricious, or harassing." *Id.* Thus, unlike the petitioner in *Samson*, Johnson had an expectation of privacy in his personal affairs subject to an officer's reasonable suspicion of an imminent or recent crime or a violation of extended supervision. *Id.*; *see Samson*, 547 U.S. at 852. Additionally, Johnson had an expectation that these searches would be conducted in a "reasonable manner" and not be "arbitrary, capricious, or harassing." Wis. Stat. § 302.113(7r).

The parties do not dispute that the state has a strong interest in ensuring that supervisees comply with the terms of extended supervision and avoid criminal behavior. *Caya*, 956 F.3d at 500. Thus, so long as the provisions of Act 79 are met, a search should be upheld. The narrow issue here is whether the officers had reasonable suspicion under Act 79 to search the Equinox beyond the scope of the window tint violation.

Individuals on extended supervision are informed that they must "[a]void all conduct which is in violation of federal or state statute, municipal or county ordinances, tribal law or which is not in the best interest of the public welfare [or their] rehabilitation." (Docket #18-2 at 1); Wis. Admin. DOC § 328.04(3)(a). Milwaukee has adopted, via ordinance, the State of Wisconsin's limits on window tinting, which permit front-tinted window and rear-tinted windows subject to certain limits. *See State v. Jennings*, No. 2019AP1539-CR, 2020 WL 7515839, at *4 (Wis. Ct. App. 2020) (unpublished) (discussing Milwaukee's adoption of the Wisconsin administrative code). Magistrate Judge Duffin concluded, without citing any authority, that the suspected window-tint violation provided a constitutional basis to search the entire car.

A suspected ordinance violation does not automatically give the police reasonable suspicion to search the entire car for contraband unrelated to that ordinance violation. *United States v. Ross*, 456 U.S. 798, 820 (1982) (explaining that a lawful search covers the area "in which the object of the search may be found"). The Government argues that *Ross* pertained to probable cause searches, not to reasonable suspicion searches. But the principle that *Ross* invokes, and the "touchstone" of any Fourth Amendment analysis, is reasonableness. *See Lange v. California*, 141 S. Ct. 2011, 2014 (2021). Indeed, the principle that a search or seizure must be

reasonably related to the object of investigation has been cited in both reasonable suspicion and probable cause searches. *See, e.g.*, *Cole*, 2021 WL 5984977, at *3 (noting that traffic stops typically require reasonable suspicion of a traffic violation, and, "[t]o be reasonable, a traffic stop must be 'justified at its inception, and reasonably related in scope to the circumstances which justified the interference in the first place'") (citing *Hiibel v. Sith Jud. Dist. Ct. of Nevada, Homboldt Cnty.*, 542 U.S. 177, 185 (2004)). This principle compels the conclusion that a search of an entire vehicle beyond the scope of the suspected supervision violation would run afoul of Act 79's limiting provisions, which require reasonableness and prohibit searches that are arbitrary, capricious, or intended to harass. Wis. Stat. § 302.113(7r).

A quick illustration demonstrates why this must be the case: imagine, for example, that a person on extended supervision lived in the Village of West Milwaukee, which prohibits hedges on side yards from exceeding four feet. W. Milwaukee, Wis. Code of Ord. § 98-123(3). If this person grew hedges that topped four feet and three inches tall, they would be in violation of the ordinance and, presumably, of their extended supervision. But, after conducting a search to confirm the violation—i.e., measuring the hedges—the police could not reasonably search the cars and every room of the house encircled by the hedges. Such a reading of the law would allow a general search out of every pretense.

Johnson provides an even more outrageous example that demonstrates the arbitrariness of the Government's argument: Whitefish Bay Ordinance section 7-14 prohibits a person from tying a rope around a public tree. If a person on extended supervision held a birthday party at a Whitefish Bay park and tied a piñata to a tree, or hung up a hammock, his

entire house could be searched. That would be an arbitrary extension of the consequences of one act to a host of unrelated behaviors. *See Terry v. Ohio*, 392 U.S. 1, 18 ("[A] search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope.").[2]

Act 79 gives Johnson a limited expectation of privacy subject to an officer's reasonable suspicion of either criminal activity or a supervision violation. Act 79 also requires searches to be "reasonable" and not arbitrary, capricious, or harassing. It follows, then, that the officers needed reasonable suspicion of drug activity, *or some other supervised release violation*, to search the car for evidence of drugs *or that violation*. Wis. Stat. § 302.113(7r); *see also* Milwaukee Police Dep't Standard Operating Proc. 085.75 ¶ E.2.a. (explaining, regarding Act 79 searches, that "the scope of the search shall be related to the reasonable suspicion possessed by the member").

---

[2]The Government argues, in a footnote, that the inevitable discovery doctrine would protect the fruits of this search because the car could have been towed for the tint violation. (Docket #31 at 18 n.4). "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *United States v. Jones*, 72 F.3d 1324, 1330, (7th Cir. 1995) (citations omitted).

There is no evidence that the car would have been towed, or legally could have been towed, based on the window tint. It appears that a window tint violation is not an arrestable offense. *See* Wis. Admin. Code § 305.04; Wis. Stat. § 110.075(7). Towing a car for tinted windows does not fall within the Milwaukee Police Department's standard operating procedures. *See* Milwaukee Police Department Standard Operating Procedure, Gen. Order 2015–22, "Towing of Vehicles," § 610.20 (describing "vehicle tow categories"). Crucially, in this case, there is no evidence that the car was towed or impounded. Thus, the Government has not established by the preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.

Searching the center console of a car for evidence of an already-confirmed tint violation under the auspices of Act 79 was not reasonable under the terms of Act 79. In the interest of thoroughness, the Court now turns to whether there was reasonable suspicion of drug activity to support the search under Act 79.

### 3.3 Reasonable Suspicion for the Drug Search

In the present case, the Government states that it was conducting a drug search of the Equinox based on reasonable suspicion that drug activity was underway. "Reasonable suspicion requires more than a hunch." *United States v. Miranda-Sotolongo*, 827 F.3d 663, 666 (7th Cir. 2016). "The officer must be able to identify some 'particularized and objective basis' for thinking that the person to be stopped is or may be about to engage in unlawful activity." *Id.* (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)). "Reasonable suspicion requires specific and articulable facts which, taken together with rational inferences from those facts, suggest criminal activity." *Lewis*, 920 F.3d at 493 (citations and quotations omitted). "Reasonable suspicion is an objective standard, considering the totality of the circumstances." *Id*. The Court will evaluate the proffered bases for reasonable suspicion below.

#### 3.3.1 Geographical Location

Being in a high-crime location, while a factor in the reasonable suspicion analysis, cannot save a search if the rest of the case is weak. *United States v. Williams*, 731 F.3d 678, 687 (7th Cir. 2013). The parties vigorously dispute whether the Wendy's parking lot is a known drug-selling location. Johnson argues that the restaurant is down the block from the police station and is a very undesirable place to transact drugs. Further, as Johnson points out, the parking lot services two business and a freeway, making it a

reasonable place for many non-illicit meetings—it is not a "facially suspicious" place like an "abandoned building." (Docket #33 at 5). The Government, on the other hand, lists two other drug-dealing arrests that occurred in the parking lot in the last fourteen months and argues that the number is under-inclusive given the nature of mobile drug dealing arrests, many of which have occurred near the police station.

The record is not clear on whether this parking lot could be considered a "high-crime" area or one that is known for drug-dealing. It is also not dispositive. Even if the Court were to resolve this disputed fact in the Government's favor, it would be insufficient to support the search. *Williams*, 731 F.3d at 687.

### 3.3.2  Bilda's actions

The Government also argues that reasonable suspicion for a mobile drug deal arose when Bilda exited her Jetta and entered the Equinox, because this pattern of behavior—waiting, then entering a recently-arrived car—was indicative of mobile drug deals. Johnson counters that drug transactions are extremely brief; Bilda, on the other hand, stayed in the car for a least four minutes, and, presumably, she would have stayed longer had the police not intervened.

This act—of waiting for someone and then getting into their car—strikes the Court as being far too innocuous to give rise to reasonable suspicion. *See State v. Gordon*, 846 N.W.2d 483, 488 (Wis. Ct. App. 2014) ("[C]ircumstances must not be so general that they risk sweeping into valid law-enforcement concerns persons on whom the requisite individualized suspicion has not focused.") (citing *Bailey v. United States*, 133 S. Ct. 1031, 1039–1040 (2013)). Waiting for someone in one car and then getting into their car when they arrive is a perfectly legal thing that people do when

Case 2:20-cr-00214-JPS   Filed 01/11/22   Page 16 of 25   Document 40

they carpool, when they must return a borrowed item, or when they meet up with ill-defined plans. In winter, when people cannot comfortably stand on the corner and chat, an idling car is a good place to talk.

Moreover, the Jetta was not the only car on the south side of the parking lot. There was another car with two people in it, but the reports do not contain any information about them aside from noting that they, too, were parked and not eating at Wendy's. Presumably, if the driver of the Equinox were engaging in a mobile drug deal, he would have wanted to shuttle Bilda out of the car quickly to transact other deals. Instead, the other car's uninvestigated presence raises another inference: it was not uncommon for people to meet up in the Wendy's parking lot.

### 3.3.3 Window Tint

The fact that Johnson drove a car with excessively tinted windows is relevant, but it does not weigh heavily on the Government's favor. The Government contends that tinted windows were an "indication[] that he was involved in drug trafficking," presumably because it concealed the identity of the driver. (Docket #31). But, cutting against this purported desire to conceal his identity, Johnson readily identified himself, his coworker, his place of work, and presented his driver's license to the police. Moreover, plenty of people in Wisconsin have tinted windows due to the glare from the sun on the snow. The Court will consider the tint in the Government's favor because the window was, in fact, tinted darker than what is permitted. However, tinted windows in a high-crime area are insufficient to raise reasonable suspicion of drug activity. *See State v. Floyd*, 885 N.W.2d 156, 162 (Wis. Ct. App. 2016) (finding "the question of reasonable suspicion" to be a "very close call," but upholding a search where the officer, who had pulled defendant over for a suspended

registration in an area with "significant" drug activity, noted "air fresheners in every vent of the vehicle as well as hanging off the rear view mirror," and tinted windows).

### 3.3.4 Explanations for Meeting

The Government's argument that the parties gave "inconsistent explanations" is a bit of an eyebrow-raiser. Upon first encountering the police and giving them the bag with cookie crumbs, Johnson told the police that he had just gotten off work. Later, when asked what he was doing in the Wendy's parking lot, Johnson told police officers that he and Bilda work together and that they "had a union meeting" and were "talking about work." Contemporaneously, and out of ear shot, Bilda told police that they "were going to a union meeting," but did not and were just "hanging out" instead.

There is nothing inconsistent about these statements. The parties met up to go to a union meeting. Johnson used the past tense because that was no longer the plan—once they met up, he and Bilda started talking about work. Then, they were interrupted by the police, who ordered Johnson out of his car, patted him down for weapons, and placed him in the rear of a police car, where he was questioned. He and Bilda met up because they "had a union meeting"—but not anymore.

Bilda, for her part, spoke in the past future tense ("we were going to a union meeting") but they did not end up going. The Court does not find it suspicious that the parties used slightly different but not-inconsistent tenses to communicate the same plan. Their answers made sense. Both Johnson and Bilda wore[3] fluorescent shirts bearing the name of the same

---

[3] "Were wearing" also works here.

company, Johnson wore a toolbelt, and Bilda told the officers she was a mason and worked out in Lake Geneva. The police officers did not ask when the union meeting was scheduled, or whether they were coming or going. And why should they have? There was no ambiguity, no reason to believe that either Johnson or Bilda were lying. This will not be included in the reasonable suspicion analysis.

### 3.3.5   Furtive Movements

The officers also stated that they observed Johnson make "furtive movements" as they approached the car. A "furtive" movement is, by definition, one that is "done in a quiet or secretive way to avoid being noticed." Merriam-Webster, "Furtive," https://www.merriam-webster.com/dictionary/furtive. In other words, a furtive movement is a non-obvious movement. It is not at all clear how Kranz could see any "furtive movements" through the car tint which, at least by the footage from the body camera, was too dark to see through.

Kranz's report also claims he saw Johnson reach behind the seat. This, too, is not evident from the body-worn camera footage. It is also not clear why this is suspicious. Assuming he was able to see into the car, Kranz's report does not say that he saw anything concerning in the back seat. Moreover, it is common for people with a passenger in the front seat to put their belongings in the back seat. "Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited." *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) (noting that "furtive" is "the preferred term because of its vagueness"). The

allegation about furtive movements lacks credibility and specificity; it will not be included in the reasonable suspicion analysis.

### 3.3.6 Nervousness

The only other piece of reasonable suspicion in the Government's arsenal is the contention that Johnson and Bilda appeared nervous. The Seventh Circuit recently stated that "[n]ervousness can raise reasonable suspicion." *Lewis*, 920 F.3d at 4983 (citing *Wardlow v. Illnois*, 528 U.S. 119, 124 (2000) (explaining that "nervous, *evasive* behavior" can give rise to reasonable suspicion) (emphasis added)). But, while nervousness can be one salvo in the artillery of reasonable suspicion, simply being nervous will not do. *United States v. Howell*, 958 F.3d 589, 599 (7th Cir. 2020); *Williams*, 731 F.3d at 687 ("Most people, when confronted by a police officer, are likely to act nervous, avoid eye contact, and even potentially shift their bodies as if to move away from the area, thus making such behaviors of very little import to a reasonable suspicion determination."); *see also Florida v. Royer*, 460 U.S. 491, 507 (1983) (finding no probable cause to arrest a "nervous young man paying cash for a ticket to New York City under an assumed name and carrying two heavy American Tourister bags"). Criminality aside, there are other reasons why a person might be nervous when stopped by the police.

The main problem with the Government's argument, though, is that neither Bilda nor Johnson appear to have been nervous. They were each polite to the police officers on first approach; they honestly and correctly identified each other and themselves; neither person appeared to be intoxicated; and the police did not see or smell anything from the car. When later questioned separately, both appeared to be a bit annoyed, but they gave consistent answers. Neither were breathing heavily, had trembling

hands, or showed perspiration. *C.f. Lewis*, 920 F.3d at 493; *Cole*, 2021 WL 5984977, at *3. While nerves may be faintly suggestive of something nefarious under certain circumstances, neither Johnson nor Bilda seemed nervous. Thus, nervousness cannot be factored into the reasonable suspicion analysis.

### 3.3.7 Totality of the Circumstances

Before searching Johnson's car, the police knew that Johnson and Bilda were coworkers who met up in a Wendy's parking lot with plans to go to a union meeting; that Johnson was on extended supervision; and that his girlfriend had a car with excessively tinted windows. The area around the Wendy's was adjacent to the police station and had seen its share of arrests, but police had no intel on whether a drug transaction was about to occur, nor any reason to suspect Johnson and Bilda, specifically, of being involved in a drug transaction. Johnson and Bilda were both cooperative, honest, and calm when speaking to the police. They separately gave consistent and plausible reasons for their meeting. The police did not observe any signs of inebriation, see any contraband in plain view, or smell anything suspicious. In short, there was no reasonable suspicion to believe Johnson and Bilda were engaging in a drug trafficking activity.

This was not like the situation in *Lewis*, where, upon being pulled over for closely tailing a truck despite a lack of traffic, the defendant's hands trembled, he had trouble controlling his breathing, and his explanation of his own travel plans was "suspiciously inconsistent." 920 F.3d at 487. In that case, the defendant said he was picking up his 26-year-old son at school in St. Louis, then explained that his son worked at a warehouse, then made other comments unrelated to picking up the son, including about returning to Chicago and his son's fight with the defendant's girlfriend. *Id.* That

meandering and nonsensical explanation, combined with the defendant's trembling hands, hard breathing, and status on supervised release, gave the officers reasonable suspicion that something was afoot. *Id*.

In the present case, the police were faced with a man on extended supervision driving his girlfriend's car, which had excessively tinted windows—meaning, although he could be ticketed for the violation, he was not necessarily responsible for tinting the windows himself. He had pulled off the interstate to the parking lot of a restaurant, where he met up with his coworker after work. There is some evidence indicating that this was an area of Milwaukee where drugs were sold, but, unfortunately, drugs are sold almost everywhere. The parking lot serves two business and is adjacent to a freeway exit, making it a relatively convenient rendezvous point for a coworker driving back to Milwaukee from a building site in Lake Geneva. As Johnson points out, he and Bilda were not meeting in an "abandoned building or some other area that is facially suspicious." (Docket #33 at 5).

Moreover, Johnson and his coworker calmly gave plausible, consistent, and innocent reasons for their meeting, which ought to have dispelled any percolating suspicion. The police extended the stop in the hopes of extracting some basis for the search, but, objectively, the situation remained unsuspicious until the police searched the car and found drugs. Johnson invoked Maslow's hammer—a confirmation bias that leads people to mistaken outcomes—and the Court will repeat it here: "[I]t is tempting, if the only tool you have is a hammer, to treat everything as if it were a nail."

### 3.4 Search of Residence & Second Motion to Suppress

The crux of Johnson's second motion to suppress is that the police violated his Fourth Amendment rights when they unlawfully entered the perimeter of his property and obtained information from Jenkins, which they later used to secure a search warrant. (Docket #29 at 2). Through counsel, Johnson explains that the delay in filing this motion was directly tied to the Government's delay in producing discovery, as well as the discrepancy between Milwaukee Police files and the Government's production. Johnson's counsel explains that this is not the first discovery issue he has had and raises the specter of sanctions. The Government does not oppose the opportunity to fully brief the issues but opposes sanctions. (Docket #31 at 30; Docket #35-1 at 3).

Magistrate Judge Duffin summarily struck the motion as untimely. Notwithstanding untimely motions, "a court may consider the defense, objection, or request if the party shows good cause." Fed. R. Crim. P. 12(c)(3). "The pretrial motions requirement embodied in Rule 12 serves an important social policy and not a narrow, finicky procedural requirement." *United States v. Salahuddin*, 509 F.3d 585, 860 (7th Cir. 2007) (citation and quotation omitted) (vacating judgment and remanding case so that defendant could litigate his motion to suppress).

Here, Johnson has shown good cause by explaining that the delay in the Government's production of evidence resulted in his untimely motion to suppress. The Government does not argue it will be prejudiced by the motion—indeed, the parties have attempted to argue the issues in that motion by way of their objections and responses to the R&R. The Court will, therefore, permit the Johnson to re-file his motion to suppress the evidence found in the house, and will revisit the matter with the benefit of the parties'

full briefing on the issues. This course of action should address any prejudice experienced by Johnson and obviate the need to consider sanctions. The Government will be free to argue that the good faith exception applies to the officers' reliance on the warrant. However, any analysis of the affidavit at this juncture would necessarily exclude all illegally obtained information, leaving very little, if anything, to work with. *United States v. Johnston*, 876 F.2d 589, 592 (7th Cir. 1989); *United States v. Markling*, 7 F.3d 1309, 1316 (7th Cir. 1993).

Accordingly, the motion for a *Franks* hearing will be denied for the time being. If the affidavit supporting the house search remains a going concern for the Government after the unconstitutionally obtained information is excised, then Johnson may renew his motion for a *Franks* hearing on the issue of whether the Wendy's parking lot was a common drug area, and whether DeWitt acted in bad faith when he stated that Bilda and Johnson gave "differing accounts" of what they were doing in the parking lot and neglected to mention that they did, in fact, appear to be coworkers. If another *Franks* hearing is requested on these facts, it ought to be granted. For now, however, the motion for a *Franks* hearing will be denied without prejudice pending additional briefing.

Accordingly,

**IT IS ORDERED** that that Johnson's motion to suppress (Docket #13) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Johnson's motion for a Frank's hearing (Docket #13) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Magistrate Judge Duffin's R&R (Docket #27) be and the same is hereby **OVERRULED as stated in the terms of this Order**;

**IT IS FURTHER ORDERED** that Jonson's unopposed motion for an extension of time (Docket #28) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the Government's motions for leave to file a sur-reply (Docket #34, #35) be and the same are hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that Johnson is granted leave to file his second motion to suppress no later than **February 18, 2022**.

Dated at Milwaukee, Wisconsin, this 11th day of January, 2022.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge